## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ANTOINETTE SALAZAR,

     Plaintiff,

v.                                                      Civ. No. 21-0256 KK

KILOLO KIJAKAZI,[1]
Acting Commissioner of the
Social Security Administration,

     Defendant.

### MEMORANDUM OPINION AND ORDER[2]

THIS MATTER is before the Court on Plaintiff Antoinette Salazar's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (the "Motion") (Doc. 17), filed September 27, 2021. The Acting Commissioner of the Social Security Administration ("Commissioner") filed a response in opposition on December 29, 2021, and Ms. Salazar filed a reply in support on January 12, 2022. (Docs. 21, 22.) Having meticulously reviewed the entire record and the relevant law, and being otherwise sufficiently advised, the Court finds that Ms. Salazar's Motion is well-taken and should be GRANTED.

---

[1] Kilolo Kijakazi was appointed Acting Commissioner of the Social Security Administration on July 9, 2021.

[2] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 28.)

## I. BACKGROUND

### A. Background and Procedural History

On May 21, 2018, at 39 years old, Ms. Salazar applied for Social Security Disability Insurance Benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq*., alleging disability due to severe vertigo, anxiety, depression, headaches, and migraines. (AR[3] 71–72.) Ms. Salazar holds a high school diploma (AR 26, 321, 415, 507) and was employed as a customer service representative, cashier, and housekeeper before she claims she became disabled. (AR 25.) In the application, Ms. Salazar alleged that her inability to work began on January 1, 2015. (AR 72.) She later amended the alleged onset date of her disability to May 21, 2017. (AR 41–42, 321.) Ms. Salazar meets the insured status requirements of the Act through December 31, 2023. (AR 12.)

Ms. Salazar's application was denied on November 1, 2018 (AR 97), and upon reconsideration on May 10, 2019. (AR 104.) After she filed a request for a hearing, Administrative Law Judge Jennifer Fellabaum (the "ALJ") held a hearing on March 3, 2020. (AR 110, 39–69.) Ms. Salazar was represented at the hearing by counsel. (AR 39–69.) In addition to Ms. Salazar's testimony, the ALJ heard testimony by Leslie J. White, a vocational expert. (AR 62–69.) The ALJ issued an unfavorable decision on June 9, 2020. (AR 10–27.) The Appeals Council denied Ms. Salazar's request for review of the ALJ's decision on January 27, 2021. (AR 1–3.) She filed the instant action on March 23, 2021. (Doc. 1.)

---

[3] Citations to "AR" are to the Certified Transcript of the Administrative Record filed in this matter on July 26, 2022. (Doc. 14.)

## B.  The ALJ's Decision

Applying the Commissioner's five-step sequential evaluation process to determine whether Ms. Salazar is disabled,[4] the ALJ found at step one that she has not engaged in substantial gainful activity since April 1, 2018.[5] (AR 13.) At step two, the ALJ found that Ms. Salazar suffers from severe, medically determinable impairments of vertigo, migraines, mild bilateral hearing loss, and anxiety. (AR 13); *see* 20 CFR 404.1520(c). At step three, the ALJ determined that Ms. Salazar's impairments do not meet or medically equal the severity of one of the listed impairments described in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (AR 14–16.)

---

[4] The five-step sequential evaluation process requires the ALJ to determine whether:

(1)    the claimant engaged in substantial gainful activity during the alleged period of disability;
(2)    the claimant has a severe physical or mental impairment (or combination of impairments) that meets the duration requirement;
(3)    any such impairment meets or equals the severity of a listed impairment described in Appendix 1 of 20 C.F.R. Part 404, Subpart P;
(4)    the claimant can return to his past relevant work; and, if not,
(5)    the claimant is able to perform other work in the national economy, considering his residual functional capacity, age, education, and work experience.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the burden of proof in the first four steps of the analysis and the Commissioner has the burden of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A finding that the claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[5] Plaintiff does not argue that this finding was error. (Doc. 17 at 4.)

At step four,[6] the ALJ found that Ms. Salazar has "the residual functional capacity [("RFC")] to perform light work[7] with the following limitations:

> [Ms. Salazar] can occasionally balance, crawl, stoop, and climb ramps and stairs. However, she can never climb ladders, ropes, or scaffolds, or be exposed to unprotected heights, hazardous machinery, or concentrated exposure to environmental irritants. She is limited to no more than occasional overhead reaching bilaterally. She cannot operate a motor vehicle for commercial purposes. The noise level of the work environment should be moderate or less.

(AR 16.) The ALJ further found that she

> can perform work at Specific Vocational Preparation (SVP) level 1 or level 2 as defined by the Dictionary of Occupational Titles (DOT), with no fast[-]paced production work and her work should be performed in the same location every day. Further, the claimant can make simple work decisions and she can occasionally interact with co-workers and supervisors[] but is limited to rarely interacting with the general public (with rarely defined as less than 10 percent of the workday).

(*Id.*) Also at step four, the ALJ found that, despite these limitations, Ms. Salazar can perform her past relevant work of housekeeper. (AR 25–26.)

The ALJ then proceeded to step five of the analysis and found that, based on her age, education, work experience, and RFC, Ms. Salazar could perform "the requirements of representative unskilled (SVP 2) occupations at the light exertional level," such as "Collator

---

[6] Step four involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must consider all of the relevant evidence and determine what is "the most [the claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is the claimant's residual functional capacity. *Id.* Second, the ALJ must determine the physical and mental demands of the claimant's past work. *Winfrey*, 92 F.3d at 1023. Third, the ALJ must determine whether the claimant is capable of meeting those demands given his residual functional capacity. *Id.* A claimant who can perform his past relevant work is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f).

[7] "Light work" involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 CFR 404.1567(b). "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* A person "considered capable of performing a full or wide range of light work . . . must have the ability to do substantially all of these activities." *Id.*

Operator" (DOT #208.685–010), "Routing Clerk" (DOT #222.687-022), and "Router" (DOT #222.587-038). (AR 27.) She concluded that Ms. Salazar "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and "is not disabled under" the Act. (*Id*.)

The Court provides further background as it is relevant to the issues discussed below.

## II.  STANDARD OF REVIEW

The Court's review of the ALJ's unfavorable decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied correct legal standards to evaluate the evidence. 42 U.S.C. §§ 405(g); 1383(c)(3); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not re-examine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the ALJ's decision if it correctly applies legal standards and is based on substantial evidence in the record. *Hamlin*, 365 F.3d at 1214.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (quoting *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003)). It is "more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084. "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118 (quoting *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir.1988)), or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole

must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan*, 399 F.3d at 1262.

"The failure [of the ALJ] to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out [her] specific findings and [her] reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

## III. DISCUSSION

Ms. Salazar argues that the ALJ erred at step four by (1) failing to properly weigh the opinions of treating providers and consultative examiners Dr. John Bond, Steve Zaffer, LPCC, Rhonda Ross, PsyD and Alysha Gallegos, PAC (Doc. 17 at 11-20); and (2) failing to consider her subjective complaints of pain and other symptoms. (*Id.* at 20-26.) The Commission disputes these arguments. (*See generally* Doc. 21.) For the reasons discussed below, the Court finds that the ALJ erred in her consideration of the opinions of Ms. Salazar's primary care physician, Dr. Bond, and that remand is warranted on this basis. The Court will not address Ms. Salazar's remaining claims of error, because they may be affected on remand. *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

Dr. Bond was Ms. Salazar's primary care physician starting in July 2018 and saw her nearly monthly. (AR 19; *see* AR 341–42, 352, 373, 377, 385, 402, 406, 437, 445, 451, 456, 463, 468, 473, 491, 498, 510.) He holds an M.D. degree and is a family medicine provider at Lovelace Westside Family Practice. (AR 341); *see also* (Doc. 17 at 14); (Doc. 21 at 9). Dr. Bond diagnosed Ms. Salazar with anxiety, vertigo, and migraines, and treated her for those conditions. *See, e.g.*, (AR 376, 380, 388, 466, 471, 477, 494, 501). On February 5, 2020, Dr. Bond completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) and (Non-Physical). (AR 434– 35). The forms asked Dr. Bond to consider Ms. Salazar's "medical history and the chronicity of findings as from one year prior to initial visit to current examination." (*Id.*)

In the form regarding Ms. Salazar's physical abilities, Dr. Bond opined that she had the following limitations:

1. Can occasionally lift and carry less than 10 pounds and frequently lift and carry less than 5 pounds,

2. Can stand or walk less than 2 hours in an 8-hour workday,

3. Must periodically alternate sitting and standing to relieve pain or discomfort,

4. Can never reach overhead with her arms,

5. Can occasionally reach below shoulder level and perform other manipulations with her arms and hands, and

6. Can never kneel, stoop, crouch, or crawl.

(AR 434.) Dr. Bond indicated that his opinions are based on his observations and/or records. (*Id.*)

Regarding Ms. Salazar's non-physical abilities, the form asked Dr. Bond to provide "an assessment of how non-physical work activities are affected by the impairment(s), injuries, or sicknesses (e.g., pain or fatigue)." (AR 435.) Dr. Bond opined that Ms. Salazar "has to rest or lie

down at regular intervals because of [her] pain and/or fatigue" and has the following limitations affecting her non-physical work activities:

1. Marked[8] limitation in her ability to maintain attention and concentrate for extended periods;

2. Marked limitation in her ability to perform activities within a schedule;

3. Marked limitation in her ability to maintain physical effort for long periods without a need to slow down or rest;

4. Marked limitation in her ability to sustain an ordinary routine without special supervision;

5. Marked limitation in her ability to make simple work-related decisions;

6. Marked limitation in her ability to complete a normal workday and workweek without interruptions from pain or fatigue based symptoms and perform at a consistent pace without unreasonable number and length of rest periods;

7. Moderate[9] limitation in her ability to maintain regular attendance and be punctual; and

8. Moderate limitation in her ability to work in coordination with/or proximity to others without being distracted by them.

(*Id*.) The abilities that Dr. Bond found were moderately or markedly limited include those required for any job. *See* Program Operations Manual System ("POMS") DI 25020.010(B)(2) -- Mental Abilities Needed For Any Job.[10] Again, Dr. Bond indicated that his opinions are based on his observations and/or records. (*Id*.)

---

[8] The form defined a "marked" limitation as a "severe limitation which precludes the individual's ability usefully to perform the designated activity on a regular and sustained basis, i.e., 8 hours a day, 5 days a week, or an equivalent schedule. The individual cannot be expected to function inde[pendent]ly, appropriately and effectively on a regular and sustained basis." (AR 435.)

[9] The form defined a "moderate" limitation as "[a] limitation that seriously interferes with the individual's ability to perform the designated activity on a regular and sustained basis, i.e., 8 hours a day, 5 days a week, or an equivalent schedule. The individual may be able to perform this work-related mental function on a limited basis. However, the individual should not be placed in a job setting where this mental function is critical to job performance or to job purpose." (AR 435.)

[10] The mental abilities needed for any job include the ability to "maintain concentration and attention for extended periods[], . . . perform activities within a schedule, maintain regular attendance, and be punctual within customary

By finding that Ms. Salazar could perform "light work," which requires frequent lifting or carrying objects up to 10 pounds and a "good deal of walking or standing," the ALJ rejected Dr. Bond's opinions as to her more restricted abilities regarding lifting, carrying, standing, and walking during a workday. *See* (AR 16); 20 CFR 404.1567(b). In addition, the ALJ rejected Dr. Bond's opinion that Ms. Salazar can never kneel, stoop, crouch, crawl, or reach overhead with her arms, as well as his opinion that she has marked non-physical limitations that preclude her ability to meet the POMS requirements for any job. (AR 16.)  The ALJ specifically found that Dr. Bond's opinions are "neither consistent with nor supported by the medical evidence." (AR 23.) The ALJ explained that Dr. Bond's opinions of Ms. Salazar's physical limitations were "unpersuasive" because they were not based on objective testing and were inconsistent with his treatment notes indicating that she had "consistently unremarkable physical examinations[.]" (AR 22–23; *see* Doc. 21 at 8.) As to Dr. Bond's assessment of Ms. Salazar's limitations affecting non-physical work activities, the ALJ stated, "Dr. Bond is not a mental health specialist, although he provided [Ms. Salazar] her psychotropic medications, primarily for anxiety. Nevertheless, [Ms. Salazar's] objective mental status findings were generally unremarkable/normal." (AR 23.)

Because Ms. Salazar filed her claims in May 2018, the ALJ's evaluation of medical source opinions is governed by 20 C.F.R. § 404.1520c ("the 2017 Regulations").[11] Under the 2017 Regulations the persuasiveness of a medical source's opinions depends on the following factors: "supportability; consistency; relationship with the claimant; specialization; and other factors, such as a 'a medical source's familiarity with the other evidence in a claim." *Zhu v. Comm'r, SSA,* —

tolerances[,] . . . sustain an ordinary routine without special supervision[,] . . . [and] work in coordination with or proximity to others without being (unduly) distracted by them[.]" POMS, DI 25020.010(B)(2).

[11] *Compare* 20 C.F.R. § 404.1520c *with* 20 C.F.R. § 404.1527 (governing evaluation of medical opinions in cases filed before March 27, 2017).

F. App'x —, 2021 WL 2794533, at *5 (10th Cir. Jul. 6, 2021), *cert. denied*, — U.S. —, 142 S. Ct. 2838 (Jun. 21, 2022) (quoting, *inter alia*, 20 C.F.R. § 404.1520c(c)). Of these factors, "supportability" and "consistency" are the "most important" and an ALJ is required to explain how she considered them when assessing the persuasiveness of a medical source's opinions.[12] 20 C.F.R. § 404.1520c(b)(2). An ALJ is not required to explain in her decision how she considered the other factors. *Id.*;[13] 20 C.F.R. § 404.1520c(c)(3)–(c)(5).

The factor of supportability "examines how closely connected a medical opinion is to the evidence and the medical source's explanations: 'The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), the more persuasive the medical opinions will be.'" *Zhu,* 2021 WL 2794533, at *6 (internal brackets and ellipsis omitted) (quoting, *inter alia*, 20 C.F.R. § 404.1520c(c)(1)). "'Consistency,' on the other hand, compares a medical opinion to the evidence: 'The more consistent a medical opinion(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) will be.'" *Zhu,* 2021 WL 2794533, at *6 (internal ellipses omitted) (quoting, *inter alia*, 20 C.F.R. § 404.1520c(c)(2)).

---

[12] The 2017 Regulations provide that the agency "will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b). Addressing the agency's "articulation requirements," the regulations state that,

> when a medical source provides multiple medical opinion(s) [sic] or prior administrative medical finding(s) [sic], we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

20 C.F.R. § 404.1520c(b)(1).

[13] However, when an ALJ finds "that two or more medical opinions . . . about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ must] articulate how [he or she] considered" the factors in 20 C.F.R. § 404.1520c(c)(3) through (c)(5).

The ALJ's conclusory rejection of Dr. Bond's opinions of Ms. Salazar's physical and non-physical limitations because they are "neither consistent with nor supported by the medical evidence" is insufficient to show what evidence the ALJ found inconsistent and, therefore, precludes meaningful review of that finding. "When explaining her findings regarding the supportability and consistency of a medical source's opinions under § 404.1520c(b), the ALJ must provide enough detail such that the Court 'can follow the adjudicator's reasoning' and determine whether the 'correct legal standards have been applied.'" *Smallwood v. Kijakazi*, No. CV 21-446 GBW, 2022 WL 4598499, at *3 (D.N.M. Sept. 30, 2022) (quoting *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012)); *see* 20 C.F.R. § 404.1520c(b)(2) (stating that an ALJ "will explain how [she] considered the supportability and consistency factors for a medical source's medical opinions . . . in [a] determination or decision").

Relying on *Endriss v. Astrue*, 506 F. App'x 772, 777 (10th Cir. 2012), the Commissioner argues that "it is evident what medical evidence the ALJ considered when the ALJ's decision is considered as a whole." (Doc. 21 at 9.) She argues that it is sufficient for the ALJ to outline the medical evidence, highlighting Dr. Bond's notes on Ms. Salazar's physical and mental status exams and the medication he prescribed.[14] (*Id.*)

The Commissioner's reliance on *Endriss* is misplaced here. In *Endriss*, the ALJ supported the decision to give little weight to a medical opinion by citing to specific exhibits in the record that contradicted that opinion. 506 F. App'x at 775. Then, the ALJ went on to reject "virtually identical" opinions expressed by another doctor without citing specific contrary evidence. *Id*.

---

[14] The Commissioner states that Dr. Bond prescribed medication only for Plaintiff's anxiety. (Doc. 21 at 9.) However, Dr. Bond's notes indicate that he also prescribed meclizine, FLUoxetine (PROzac), diazepam, and scopolamine to treat Plaintiff's vertigo. (AR 442, 448, 494, 515).

at 777. The Tenth Circuit Court of Appeals held that review of the ALJ's rejection of the second doctor's opinion was possible because "the ALJ's reference to 'objective medical evidence' [means] the same evidence from the same exhibits he relied on as being inconsistent with the similar restrictions proposed by" the first doctor. *Id*. The key fact in *Endriss* is that evidence contrary to both doctors' opinions was specifically cited.

Here, unlike in *Endriss*, the ALJ's decision does not utilize the same reasoning to reject two virtually identical opinions. Except for the ALJ's references to Dr. Bond's physical exams[15] and mental status findings, which are addressed below, the ALJ did not point to specific evidence or cite to exhibits in the record in her discussion of Dr. Bond's opinions. *See Valenzuela v. Berryhill*, No. CV 16-522 CG, 2017 WL 3207159, at *4 (D.N.M. May 2, 2017) (unreported) (distinguishing *Endriss* because the ALJ did not cite to any evidence in rejecting a physician's opinion). And the ALJ's discussion of other medical evidence elsewhere in her opinion does not make any specific connection to Dr. Bond's opinions or otherwise provide a clear basis on which the Court may meaningfully review her rejection of them. *See O'dell v. Colvin*, No. 1:15-CV-00628-CBS, 2016 WL 5395247, at *5 (D. Colo. Sept. 27, 2016) (unreported) (distinguishing *Endriss* and holding that the ALJ's recitation of the evidence was insufficient because it did not "make any specific connections" between the evidence and the opinions rejected). "Without even

_____

[15] The ALJ did note that Plaintiff had "consistently unremarkable physical examinations, except approximately two positive Romberg tests in the remote past." (AR 23; *see* AR 408, 441.) "The R[]omberg test is positive when the patient has a loss of balance with their eyes closed. Loss of balance can be defined as the increased swaying of the body, foot movement in the direction of the fall, or falling." *See* Forbes J, *et al*, Romberg Test. [Updated 2022 Jul 29]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2022 Jan-., National Center for Biotechnology Information, https://www.ncbi.nlm.nih.gov/books/NBK563187/ (last visited October 25, 2022). As discussed further below, the ALJ did not explain how unremarkable physical examinations undermine Dr. Bond's opinions, and positive Romberg test results support Dr. Bond's opinions.

a reference to specific medical evidence, the Court is left to guess at how exactly Dr. [Bond's] findings were unsupported by the record." *Valenzuela*, 2017 WL 3207159, at *4.

The ALJ also found that Dr. Bond's opinions of Ms. Salazar's physical limitations were not supported because his opinions conflict with his notes on Ms. Salazar's physical exams. (AR 22–23); *see Zhu,* 2021 WL 2794533, at *6 (stating that "'[s]upportability' examines how closely connected a medical opinion is to the evidence and the medical source's explanations") This finding is problematic for two reasons. First, this finding does not address why the ALJ found Dr. Bond's opinions persuasive in part and unpersuasive in part. The ALJ apparently accepted Dr. Bond's opinions that Ms. Salazar is limited in her abilities to lift and carry but rejected his opinions as to carrying frequency and weight restrictions. Similarly, the ALJ accepted Dr. Bond's opinion that Ms. Salazar has a limited ability to kneel, stoop, crouch, crawl or raise her arms overhead, but rejected his opinion that she can never do those things. But because Dr. Bond's is the only medical opinion in the record addressing these physical capabilities, there is no other medical opinion evidence providing a basis for the ALJ to determine that Ms. Salazar is not as limited in her physical abilities as Dr. Bond opined. Thus, it is not clear how the ALJ determined that Dr. Bond's opinions as to the *existence* of Ms. Salazar's limitations are supported by his treatment notes and physical exams, but his opinions as to the *extent* of those limitations are not.

Second, having found that Ms. Salazar has episodic vertigo (AR 25), the ALJ erred in not explaining how she considered the physical exams in the context of that diagnosis. *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (stating that evidence must be considered in the context of the "overall diagnostic picture the provider draws" (quotation marks omitted)). As Ms. Salazar's treating physician who saw her nearly monthly starting in July 2018, Dr. Bond was aware of Ms. Salazar's normal physical exams when he diagnosed her with vertigo, treated her for that

condition, and opined on her limitations. (AR 19; *see* AR 341–42, 352, 373, 377, 385, 402, 406, 437, 445, 451, 456, 463, 468, 473, 491, 498, 510.) Considered in the context of his diagnosis, the normal physical exams do not obviously conflict with Dr. Bond's opinions because, even if the ability to make certain movements is not impaired, vertigo symptoms can be triggered by such movements, such as motion of the head or walking.[16] Dr. Bond's opinions of Ms. Salazar's limitations are consistent with avoiding such movements.

Also, the ALJ did not explain how, given the episodic nature of Ms. Salazar's vertigo, Dr. Bond's opinions are undermined by the fact that Ms. Salazar did not exhibit physical symptoms while in his office. *See Spencer v. Astrue*, No. 3:10CV00365, 2012 WL 404896, at *10 (S.D. Ohio Feb. 8, 2012) (unreported) (holding that an ALJ erred in not considering the episodic nature of the claimant's conditions, including vertigo), report and recommendation adopted sub nom. *Spencer v. Comm'r of Soc. Sec.*, No. 3:10CV365, 2012 WL 966053 (S.D. Ohio Mar. 21, 2012); *Kevin M. v. Comm'r of Soc. Sec.*, No. C19-125 TLF, 2020 WL 503086, at *4 (W.D. Wash. Jan. 31, 2020) (unreported) (stating, "[w]hile the ALJ cited . . . neurological findings—such as normal gait, range of motion, and straight leg raising tests—these findings do not undermine plaintiff's claims of pain, dizziness, and resulting limitations, which the record suggests are due to fibromyalgia and migraines—conditions that would not result in abnormal imaging or neurological findings").

The ALJ's reasons for rejecting Dr. Bond's opinions of Ms. Salazar's non-physical limitations are also inadequate. In justification for discounting Dr. Bond's opinions, the ALJ stated,

---

[16] For example, "[a]ctivities that bring about the signs and symptoms of [benign paroxysmal positional vertigo, one of the most common types of vertigo] can vary from person to person, but are almost always brought on by a change in head position. Some people also feel out of balance when standing or walking." Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/vertigo/symptoms-causes/syc-20370055 (last visited October 25, 2022). In addition, "[d]izziness and sensitivity to motion (vestibular migraine) can occur due to migraine. Migraine is a common cause of dizziness." Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/balance-problems/symptoms-causes/syc-20350474 (last visited October 25, 2022).

"Dr. Bond is not a mental health specialist, although he provided the claimant her psychotropic medications, primarily for anxiety. Nevertheless, the claimant's objective mental status findings were generally unremarkable/normal." (AR 23.) This justification is faulty because (A) Dr. Bond's opinions of non-physical limitations are mostly based on Ms. Salazar's pain or fatigue, (B) the ALJ did not adequately explain how Dr. Bond's treatment notes conflict with his opinions, and (C) the fact that Dr. Bond is not a mental health specialist is not an adequate basis for rejecting his opinions on the record of this case. The Court will address these issues in turn.

Neither of the ALJ's reasons for rejecting Dr. Bond's opinions of non-physical limitations apply to Dr. Bond's opinions that are specific to the effects of pain and/or fatigue, and not attributed to mental conditions. For example, Dr. Bond opined that Ms. Salazar "has to rest or lie down at regular intervals because of [her] *pain and/or fatigue*" and has marked limitations in her ability to "[m]aintain *physical effort* for long periods without a need to decrease activity or pace, or to rest intermittently" and to "[c]omplete a normal workday and workweek without interruptions *from pain or fatigue[-]based symptoms* and to perform at a consistent pace without unreasonable number and length of rest periods." (AR 435 (emphasis added).) These limitations therefore do not arise from Ms. Salazar's mental health and the ALJ erred to the extent she rejected these opinions as inconsistent with Dr. Bond's mental status findings or because he is not a mental health specialist.

The ALJ also erred in failing to explain how Dr. Bond's notes stating that Ms. Salazar's "generally unremarkable/normal" mental status findings[17] conflict with his opinions on her non-

---

[17] The ALJ refers to "mental status findings" and "mental status examinations." (*See, e.g.*, AR 19, 20, 22.) "[A] mental status examination is 'an assessment of current mental capacity through evaluation of general appearance, behavior, any unusual or bizarre beliefs and perceptions (e.g. delusions, hallucinations), mood, and all aspects of cognition (e.g. attention, orientation, memory)[.]'"*se e Tumlin v. Comm'r of Soc. Sec.*, No. 219CV00457JLBNPM, 2021 WL 1214880, at *11 n.16 (M.D. Fla. Mar. 31, 2021) (quoting the Merck Manual,

physical limitations that could arise from her pain, fatigue and "mental problems".[18] (AR 434; *see also* AR 354, 375, 380, 387–88, 404, 408, 454, 459, 471, 476, 493–94, 500–01, 512; *but see* 440 (confusion, not nervous), 466 (seen for depression).) "[I]t is entirely proper for an ALJ to consider [mental status] findings when evaluating the supportability of a medical opinion concerning a claimant's overall mental functioning and limitations [but] such findings are not necessarily dispositive to this analysis." *Casas v. Saul*, No. 19-cv-1154, 2021 WL 107244, at *5 (D.N.M. Jan. 12, 2021) (citations and quotation marks omitted). This is so because mental status findings "document a clinician's observations of the patient at *a particular point in time.*" *Id*. Because they pertain to a point in time, unremarkable mental status findings in a physician's office do not necessarily address a patient's ability to perform consistently in the workplace. *See Martinez v. Comm'r of Soc. Sec. Admin.*, No. 6:18-03332-CV-RK, 2020 WL 39199, at *2 (W.D. Mo. Jan. 3, 2020) ("Although the[] mental status reports suggest[ed] [the p]laintiff was capable of acting appropriately at particular moments in time, they d[id] not speak to [the p]laintiff's ability to consistently appear for work, stay on task, and perform appropriately. Accordingly, this [wa]s an insufficient justification to disregard [the] opinion."). In addition, the relevance of a mental status finding depends on the opinions at issue. For example, "[t]he observations that plaintiff is alert,

---

https://www.merckmanuals.com/professional/neurologic-disorders/neurologic-examination/how-to-assess-mental-status)).

[18] The non-physical medical assessment form completed by Dr. Bond is not the same form as the mental medical assessment form completed by Steve Zaffer, LPCC. (*Compare* AR 434-435 *with* AR 524-527.) The forms consider different types of limitations. Whereas the mental assessment form considers the areas of functioning listed in the "paragraph B" criteria and limitations related to mental impairments, the non-physical assessment form generally considers limitations on "non-physical work activities" caused by pain symptom due to physical impairments. (AR 435, 524-25.) As such, Ms. Salazar argues that Dr. Bond did not base his assessment of non-physical limitations on Plaintiff's mental health condition. (Doc. 17 at 13–14.) However, Dr. Bond checked "yes" to the statement that non-physical work activities "[a]re affected by symptoms like pain, sleep disturbances, visual difficulties, neurocognitive problems, fainting, dizziness, or *mental problem*." (AR. 434 (emphasis added).) Dr. Bond diagnosed Ms. Salazar with both physical and mental health conditions, and some of his assessed limitations could be impacted by either or both. Because the Court finds that the ALJ's rejection of Dr. Bond's opinions was error regardless of whether they were based on Plaintiff's physical or mental conditions, or both, the Court need not parse this issue further.

oriented, pleasant, shows improved affect, shows a lack of anxiety, has good eye contact, is not drowsy or intoxicated, and is not in pain are not, on their face, clearly incompatible with findings of marked limitations in the general categories of understanding and memory, sustained concentration and persistence, social interaction, or adaptation." *Wren v. Astrue*, No. 06-1158 MLB, 2007 WL 1531804, at *6 (D. Kan. May 23, 2007); *Perez v. Comm'r of Soc. Sec.*, 625 F. App'x 408, 418 (11th Cir. 2015) (stating that the treatment notes showing that the plaintiff "was cooperative, had good eye contact, and had no delusions or compulsions . . . do not contradict [the medical source's] ultimate conclusion[] concerning [the plaintiff's] inability to function in a work setting"). Finally, a finding that a patient's mood, affect, and behavior are normal are not obviously inconsistent with the treating provider's diagnosis and treatment of a patient for mental health conditions. *See Tumlin*, 2021 WL 1214880, at *12 (stating that the treating providers' opinions were not inconsistent with "[r]elatively normal mental status examinations [that] occurred during therapy sessions when the reporting nurse practitioner or therapist also reported serious mental health issues and the need for continued care").

Dr. Bond indicated that his assessment of Ms. Salazar's non-physical limitations is based on his observations and records. (AR 435.) Hence, Dr. Bond considered the mental status findings and nevertheless assessed Ms. Salazar with substantial limitations in her abilities. Furthermore, Dr. Bond's opinions are specific to "work activities." (*Id.*) For example, he opined that she is limited in her ability to "[m]aintain attention and concentration for extended periods (i.e., 2-hour segments)," "[p]erform activities within a schedule," and "[m]ake simple work-related decisions." (*Id.*) The ALJ did not explain how findings that Ms. Salazar was oriented to person, place, and time, or had normal mood and affect during visits to his office conflict with Dr. Bond's opinions about her ability to consistently perform in the workplace given her diagnosis. The ALJ also did

17

not explain her treatment of Dr. Bond's mental status findings in the context of other opinions in the record, such as those of Ms. Gallegos and Mr. Zaffer, which are discussed further below. (AR 419, 524–27.) Without this explanation, the Court cannot assess this aspect of the ALJ's decision.

Finally, to the extent the ALJ rejected his opinions because Dr. Bond is not a mental health specialist, this factor alone is insufficient to discount a primary care doctor's opinion. *See Landon B. v. Kijakazi*, No. 2:21-CV-00217, 2022 WL 4365953, *6 (D. Utah Sept. 21, 2022). Under 20 C.F.R. § 404.1520c(4),

> "[t]he medical opinion . . . of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty *than the medical opinion . . . of a medical source who is not a specialist in the relevant area of specialty*."

(Emphasis added.) In her discussion, the ALJ did not specify that Dr. Bond's opinions were less persuasive to her than an opinion on the same issue by a particular specialist. Nor could she on the record in this case. Although not all of Dr. Bond's opinions were also addressed by mental health specialists, his opinions are generally consistent with those of Steve Zaffer, Licensed Professional Clinical Counselor,[19] and Alysha Gallegos, PA-C, who conducted a psychological evaluation on request by the New Mexico Department of Social Security. (AR 414.)

Mr. Zaffer, who began treating Ms. Salazar in December 2018 and saw her weekly, opined that she has marked limitations in her abilities to (1) "work in coordination with/or proximity to others without being distracted by them," (2) "maintain attention and concentration for extended periods," and (3) "complete a normal workday and workweek without interruptions from

---

[19] The Commissioner concedes that the ALJ erred in describing Mr. Zaffer as a non-medical source. (Doc.21 at 10); *see* 20 C.F.R. § 404.1502(d) ("Medical source means an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.").

psychological-based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods." (AR 523–25; AR 526–27 (marked limitation in understanding, remembering, or applying information, as well as in ability to concentrate, persist, or maintain pace). He also opined that Ms. Salazar is "easily fatigued" (AR 526) and has a moderate limitation in her ability "[m]aintain regular attendance and be punctual within customary tolerance." (AR 524). These opinions are consistent with Dr. Bond's opinions. (AR 435.)

In her report, Ms. Gallegos opined that Ms. Salazar's abilities to "[u]nderstand, retain and follow instructions" and to "[s]ustain attention to perform simple, repetitive tasks" were "intact." (AR 419.) However, she found that Ms. Salazar's ability to "[r]elate to others, including fellow workers and supervisor[s]" and to "[t]olerate the stress/pressures associated with day[-]to[-]day work activity" were "impaired." *Id*. Ms. Gallegos further opined that Ms. Salazar "will [not] be able to tolerate daily work stress or relate to fellow workers due to the level of her anxiety from her medical problems. If her vertigo and migraines were better controlled that would help reduce her anxiety." *Id*. She concluded that Ms. Salazar's "anxiety will impair her ability to hold employment at this time." (AR 418.) These opinions are consistent with Dr. Bond's opinion that Ms. Salazar has moderate or marked limitations on her ability perform "day-to-day work activity," such as maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, work in coordination with/or proximity to others without being distracted by them, and make simple work-related decisions. (AR 435.)

In sum, the ALJ's reasons for discounting Dr. Bond's opinions are not legally valid or supported by the evidence. Normal physical and mental status findings in Dr. Bond's office are not inconsistent with his assessment that Ms. Salazar's conditions limit her ability to perform

consistently in the workplace. Nor is the fact that Dr. Bond is not a mental health specialist a sufficient basis for rejecting his opinions.

The ALJ's treatment of Dr. Bond's opinions is not harmless.[20] Had the ALJ properly evaluated Dr. Bond's opinions, she may have given them greater weight, leading to a more restrictive RFC. *See Harrold v. Berryhill*, 714 F. App'x 861, 870 (10th Cir. 2017) (holding that the ALJ's rejection of medical source opinions was not harmless where, "if credited by the ALJ on remand, [the medical opinions] could alter the ALJ's RFC determination and potentially change the outcome"). For example, the Court notes that at the March 2020 hearing, the vocational expert based her testimony about Ms. Salazar's past relevant work and the jobs of collator operator, routing clerk, and router on a hypothetical set of limitations that did not include some of Dr. Bond's limitations. Specifically, the ALJ posed the following hypothetical to the vocational expert:

> assume a person of the same age, education and work experience as [Ms. Salazar].
> Further assume that this person can perform work at the *light exertional level*. They
> can *occasionally* balance, crawl, stoop and climb ramps and stairs. They can never
> climb ladders, ropes or scaffolds or be exposed to unprotected heights or hazardous
> machinery or concentrated exposure to environmental irritants. They
> cannot operate a motor vehicle for commercial purposes. The noise level of the work
> environment should be moderate or less. They can *occasionally* reach overhead
> bilaterally. The person can perform work at the SVP 1 or 2 level, as defined by the
> Dictionary of Occupational Titles, with no fast[-]paced production work. The work
> should be performed in the same location every day. The person can make simple
> work decisions and they can *occasionally* interact with coworkers and supervisors,
> but rarely interact with the general public, which I define as less than 10% of the
> workday.

(AR 64. (Italics show differences with Dr. Bond's opinion.)) The vocational expert responded that Ms. Salazar's prior work as housekeeper, as well as the jobs of collator operator, routing clerk,

---

[20] The Commissioner does not argue that any error related to Dr. Bond's opinions is harmless. (Doc. 21 at 8–10.)

and router, would fit within the hypothetical limitations. (AR 64–65.) The ALJ and the vocational

expert then had the following exchange:

> ALJ: So, if a person with those limitations was going to be off task 10% or more of the workday, on a regular and continuing basis, would the person be able to do the past work, as a housekeeper?

> Vocational Expert: No, I don't believe so, Your Honor. That 10% off task is really sort of on the line, but I do think if the worker is consistently off task like that, they can't maintain employment.

> ALJ: And then that same for other jobs in the national economy?

> Vocational Expert: I believe so, Your Honor.

> ALJ: And then what about absences? If the person was going to be absent two or more days per month and by absent, I don't just mean missing the whole day of work, I mean showing up late or having to call off shift early. Would that person be able to do the past work or other work?

> Vocational Expert: You know, I don't believe so. Again, that's too much time away from the job site for them to meet their production requirements, whatever they might be for that particular job. If they're not there, they're not getting their work done.

(AR 66.) Thus, the ALJ's rejection of Dr. Bond's assessment that Ms. Salazar must "rest or lie

down at regular intervals," and that she has marked limitations in her abilities to "maintain physical

effort for long periods without a need to decrease activity or pace or to rest intermittently" and to

"complete a normal workday and workweek without interruptions from pain or fatigue-based

symptoms" was essential to her determination that Ms. Salazar is not disabled and, therefore, not

harmless. *Cf. Mays v. Colvin*, 739 F.3d 569, 578–79 (10th Cir. 2014) (failure to provide adequate

reasons for rejecting a medical source opinion "involves harmless error if there is no inconsistency

between the opinion and the ALJ's assessment of [RFC]").

## IV. CONCLUSION

The ALJ failed to provide adequate reasons for rejecting Dr. Bond's opinions of Ms.

Salazar's limitations. The Court, therefore, cannot determine whether the ALJ properly evaluated

Dr. Bond's opinions and whether her rejection of those opinions is supported by substantial evidence. IT IS THEREFORE ORDERED that Ms. Salazar's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 17) is GRANTED, and this matter is REMANDED to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent